UPON A REHEARING EN BANC
ROBERT J. HUMPHREYS, Judge.
This matter comes before the Court on a rehearing en banc from an unpublished panel decision rendered December 9, 2003. See Medley v. Commonwealth, 03 Vap UNP 1567021, 2003 WL 22887860 (2003). In that decision, a divided panel of this Court reversed Medley’s convictions for possession of *24 cocaine with intent to distribute (in violation of Code § 18.2-248) and transporting more than one ounce of cocaine into the Commonwealth with the intent to distribute (in violation of Code § 18.2-248.01), finding that police officers failed to “scrupulously honor” Medley’s invocation of his Miranda rights and, therefore, that the trial court should have granted Medley’s motion to suppress evidence.
By order dated January 13, 2004, we granted the Commonwealth’s petition for a rehearing en banc, stayed the mandate of that decision, and reinstated the appeal. Upon rehearing this case en banc, we affirm Medley’s convictions.
I. Background
On appeal of a denial of a motion to suppress, we consider the evidence presented below in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va.App. 1066, 1067, 407 S.E.2d 47, 48 (1991).
So viewed, the evidence presented during the hearing on Medley’s motion to suppress the evidence established that on the afternoon of August 17, 2000, State Police Officer C.S. Wade and several other officers were assigned to monitor southbound traffic at the toll plaza of the Chesapeake Bay Bridge in Northampton County and to “intercept people smuggling guns and.drugs ... from the New York area ... to the Tidewater area.” While looking “for violations on the vehicles and ... for any unusual responses or reactions as [occupants] approaeh[ed] the toll booth,” Officer Wade observed a 1996 Pontiac Sunfire approach the booth. The car’s license plate number had a prefix on it that Officer Wade was not “familiar with as being issued over here on this side of the water,” so he “assumed that this vehicle was from across the bay.” Officer Wade, who was standing near the toll booth where he could be seen by the driver, looked into the car and noticed that the driver’s “eyes were bugged out,” “[t]hey were great big and round.” For that reason, Officer Wade asked *25 one of Ms fellow officers, Trooper Hawkins, to cheek the car “when it came up in his lane of travel.”
When Medley, the driver, stopped to pay the toll, Trooper Hawkins observed that the car had a “dark window tint” and that there was a “dangling object in the rear-view mirror.” Trooper Hawkins advised Medley “that his window tint appeared to be too dark under Virgima law and [that] it was also a violation to have any objects hanging from the mirror that could obstruct your view.” He then asked Medley to pull over so that he could “talk to him about those violations.”
When Trooper Hawkins asked Medley for Ms driver’s license and registration, Medley said he had no identification. After a female passenger indicated that the automobile was hers and gave Trooper Hawkins the registration, Trooper Hawkins walked Medley to his car so that he could “r[u]n him through DMV.” While Trooper Hawkins and Medley waited for the report concerning Medley’s driving status, Hawkins asked Medley “where he was coming from.” Medley said he and his passenger intended to drive to New York from Norfolk, but they had had an argument and were returning to Norfolk. At some point, Trooper Hawkins learned that Medleys driver’s license was suspended.
During that time, another officer, Special Agent Wendell, questioned Medley’s female passenger about her travel. After talking with her, Wendell advised Hawkins as to their conversation, and the two officers determined that the stories “didn’t match.” Officer Wade, who had also spoken with Medleys passenger, then approached Trooper Hawkins’s patrol car and advised that he was “going to run a K-9 on the veMcle.” Medleys female passenger “became very excited, very nervous.”
As Officer Wade graded the dog around the Pontiac, the dog alerted near a rear door. Based upon the alert, Officer Wade looked inside the car and found, behind the driver’s seat, a black, semi-transparent plastic bag containing a cereal box. Inside the box, he found “approximately 250 grams of what [he] believed to be ... cocaine.”
*26 At that point, Trooper Hawkins handcuffed Medley and left him alone in his patrol car. Special Agent Wendell handcuffed the passenger and read her the Miranda warnings. Wendell then, in conjunction with Officer Wade, questioned the passenger again about “her trip up north.” The passenger stated: Medley promised her $200 for taking him to New York; she noticed Medley had about $2,500 in a roll of money during the trip; she left the car to go to the bathroom when they arrived in New York, while Medley was talking with “a bunch of people”; she and Medley then “rode around for awhile,” but eventually drove back to the same place; she left the car again and bought a “juice and some gum”; they then “left and came straight back” to Virginia; she noticed the cereal box when they were driving through Delaware, and Medley told her “his people gave it to him and not to worry about it.”
After speaking with Medley’s passenger, Special Agent Wendell went to Trooper Hawkins’s vehicle and read Medley his Miranda rights. When he asked Medley if he understood those rights, Medley replied that he did. Special Agent Wendell then asked Medley if he wished to waive his rights and talk with him.. Medley responded that “he would talk to [Special Agent Wendell], but he didn’t want to waive his rights.” Special Agent Wendell testified that the following then occurred:
For several minutes I continued to talk to Mr. Medley saying I read him his Miranda rights. I asked him which rights he wished — that he wanted to invoke, and he said he wanted all of his rights. I told him that I cannot talk to him because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with — excuse me — with you during questioning; and at that time he stated, I want all my rights, but I still want to talk to you. I again explained to him, I cannot talk to you — and I overemphasized that I cannot talk to him at all without having his waiver of rights; and he said, I don’t want, to waive anything on this. I want this sheet to remain the same — and this would be the sheet that I marked yes and then no — but I will talk to you.
*27 Special Agent Wendell testified that he then asked another officer, Sergeant Clark, to join him. Both officers “tried to explain over and over again to him that if he wishes to enact his Miranda rights, [they could not] talk to him.” Medley responded that he understood his rights and said he “did not want to waive his rights, but ... would talk to [them].” The officers then told Medley that if he wanted to speak with them, he would have to initiate the conversation. They then walked away from the patrol car and joined the other officers in searching the Pontiac.
A few moments later, Trooper Hawkins returned to his vehicle and read Medley his Miranda rights once again. Medley “wasn’t talking at that point,” and “he wouldn’t say that he understood his rights.” When Trooper Hawkins asked Medley if he wanted to waive his rights, Medley “[went] as far as acknowledging his understanding; but he would not say, I waive my rights.” Trooper Hawkins then “determined, unless [Medley] approached [him] and wanted to talk to [him] again, [he] wasn’t going to have any more conversation.”
The record is silent as to what occurred immediately thereafter. However, within approximately thirty minutes after Special Agent Wendell had begun searching the Pontiac, Trooper Hawkins came to him and said, “[Medley] wants to talk to you.” During the suppression hearing, Special Agent Wendell testified that the following then occurred:
I then proceeded back to the vehicle and asked Mr. Medley, Do you want to talk to me? He said, Yes, I want to talk to you.
I again explained to him, if you’re not willing to waive your rights, I cannot talk to you. He said, I — quote and unquote — Mr. Medley stated that he could talk to me because she had nothing to do with the investigation. I then explained to Mr. Medley,. I don’t want to talk to you unless you’re willing to waive your rights; and he said, I’ll talk to you. I just don’t want anything to be used against me. I’ll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he *28 consistently told me that he wanted to talk to me; and, therefore, I began talking to him.
Special Agent Wendell further testified that Medley responded to his “questioning” and said that his passenger knew nothing, that he was being paid $1,500 for taking “the item” to Norfolk, that another car was following them to Norfolk, and that he was to deliver the item to the occupants of the other car in Norfolk.
Medley, a convicted felon, testified that he told all the officers he did not want to waive his rights and denied telling them he wanted to talk to them. He testified that when he told them he would not make a statement, he gave them his lawyer’s business card. Medley claimed one of the officers ripped it while talking to him. He testified that Trooper Hawkins “kept asking questions” and talked for thirty to forty minutes about waiving his rights. Medley denied making any statements to Special Agent Wendell about going to New York or making a delivery to the people in a car following him.
The trial judge denied Medley’s motion to suppress, ruling as follows:
I think he had a right to stop him, and ... if you believe his testimony, he didn’t make any statements. So there is nothing to be suppressed. If you believe the officers’ testimony, he didn’t waive his rights; but he initiated the conversation. So I would overrule the motion.
Medley subsequently entered “conditional” pleas of guilty to the charges, purportedly based upon North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[1] This appeal followed.
*29 II. Analysis
We begin by recognizing the well-settled maxim that on an appeal of a ruling on a motion to suppress, “we are bound by the trial court’s findings of historical fact unless ‘plainly wrong’ or without evidence to support them,” McGee v. Commonwealth, 25 Va.App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc), but we review de novo the trial court’s application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case, Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).
We next note that in the appellant’s brief Medley filed before the panel, the issue Medley presented is whether, “[t]he trial court erred in dismissing appellant’s motion to suppress the evidence seized from the vehicle and appellant’s incriminating statement, as the same were seized in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.” However, in an apparent violation of Rule 5A:20(e), Medley’s panel brief contained no argument or authority suggesting any Fourth Amendment violation. We thus, have no basis to consider the application of the Fourth Amendment further. See Rule 5A:20(e) (“The opening brief of appellant shall contain ... [t]he principles of law, the argument, and the authorities relating to each question presented.”).
Medley asserted during oral argument that the police conduct at issue here, violated his “right not to incriminate himself as secured by the Fifth and Fourteenth Amendments.” Specifically, Medley has contended on appeal (at least implicitly) that police violated his right to remain silent, as well as his right to counsel under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Assuming, without here deciding, that Medley’s broad and unfocused question presented was sufficient to preserve both arguments, we find that the evidence below established police did not violate Medley’s “right not to incriminate himself as secured by the Fifth and *30 Fourteenth Amendments.” Therefore, we affirm his convictions.
A.
We first address Medley’s argument that police violated his Miranda right to counsel. An issue of whether an accused “clearly requested an attorney during a custodial interrogation is a mixed question of law and fact.” Commonwealth v. Redmond, 264 Va. 321, 326, 568 S.E.2d 695, 697 (2002) (plurality opinion). “ ‘[T]he determination of what [the accused] actually said is a question of fact that we review only for clear error.... Whether those words are sufficient to invoke the right to counsel is a legal determination that we review de novo.’ ” Id. at 327, 568 S.E.2d at 698 (quoting United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir.1993) (other citation omitted)).
In the appellate brief Medley filed before the panel, Medley cited only Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), as authority in support of his position that police violated his rights “under the Fourth, Fifth and Fourteenth Amendments.” In Edwards the United States Supreme Court recognized that:
In Miranda v. Arizona, [384 U.S. 436, 86 S.Ct. 1602 (1966)], the Court determined that the Fifth and Fourteenth Amendments’ prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. 384 U.S., at 479, 86 S.Ct., at 1630. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, “the interrogation must cease.” If he requests counsel, “the interrogation must cease until an attorney is present.” Id., at 474, 86 S.Ct., at 1627.
451 U.S. at 481-82, 101 S.Ct. at 1883.
In order to “prevent police from badgering a defendant into waiving his previously asserted Miranda rights” and to *31 “protect the suspect’s ‘desire to deal with the police only-through counsel,’ ” the United States Supreme Court established the “Edwards rule” as a “second layer of prophylaxis for the Miranda right to counsel.” See Davis [v. United States], 512 U.S. [452] at 458, 114 S.Ct. [2350] at 2355 [129 L.Ed.2d 362 (1994)]; McNeil v. Wisconsin, 501 U.S. 171, 176, 178, 111 S.Ct. 2204, 2208, 2209, 115 L.Ed.2d 158 (1991); Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990).
Quinn v. Commonwealth, 25 Va.App. 702, 710-11, 492 S.E.2d 470, 474-75 (1997).
Specifically, Edwards extended the principles set forth in Miranda “to subsequent interrogation, holding that, ‘... an accused, ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.’” Commonwealth v. Gregory, 263 Va. 134, 146-47, 557 S.E.2d 715, 722 (2002) (quoting Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885). Thus, “[t]he prophylaxis of Miranda and Edwards provides the right to have counsel present during interrogation as an additional safeguard in the exercise of the right against self-incrimination” Id. at 147, 557 S.E.2d at 722 (emphasis added).
However, “[w]hether the Edwards rule renders a statement inadmissible is determined by a three-part inquiry.” Quinn, 25 Va.App. at 712, 492 S.E.2d at 475. The first part of that inquiry calls for a determination of whether “ ‘the accused actually invoked his right to counsel.’ ” Id. (quoting Tipton v. Commonwealth, 18 Va.App. 832, 834, 447 S.E.2d 539, 540 (1994)) (emphasis added). The evidence in the case at bar does not satisfy that first portion of the analysis.
The United States Supreme Court has “ruled that the test for determining whether the accused invoked the right to counsel is an objective one.” McDaniel v. Commonwealth, 30 Va.App. 602, 605, 518 S.E.2d 851, 853 (1999) (citing Davis, 512 *32 U.S. at 457-59, 114 S.Ct. at 2354-55). Thus, a court “must determine whether the accused ‘articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.’ ” Id. (quoting Davis, 512 U.S. at 459, 114 S.Ct. at 2355); see also Gregory, 263 Va. at 147, 557 S.E.2d at 723 (“The Edwards rule does not apply unless the prior interrogation was custodial and during that custodial interrogation, the suspect clearly and unequivocally invoked his right to counsel.”).
Here it is clear, as the trial court found, that Medley indicated to police he did not wish to waive his “rights.” Nevertheless, contrary to Medley’s assertions, such a general refusal to waive his rights, standing alone, is hardly sufficient to convey to police a clear and unequivocal request for counsel. As the United States Supreme Court explained in Davis, “[invocation of the Miranda right to counsel ‘requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.’ ” 512 U.S. at 459, 114 S.Ct. at 2355 (quoting McNeil, 501 U.S. at 178, 111 S.Ct. at 2209).
[T]he suspect must unambiguously request counsel. As we have observed, “a statement either is such an assertion of the right to counsel or it is not.” Smith v. Illinois, [469 U.S. 91, 97-98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984)] (brackets and internal quotation marks omitted).... Although a suspect need not “speak with the discrimination of an Oxford don,” ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, [475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 1147 n. 4, 89 L.Ed.2d 410] (1986) (“The interrogation must cease until an attorney is present only if the individual states that he wants an attorney”) (citations and internal quotation marks omitted).
*33 Id. (emphasis in original). In explanation of the underlying rationale, the Supreme Court stated:
In considering how a suspect must invoke the right to counsel, we must consider the other side of the Miranda equation: the need for effective law enforcement. Although the courts ensure compliance with the Miranda requirements through the exclusionary rule, it is police officers who must actually decide whether ... they can question a suspect. The Edwards rule — questioning must cease if the suspect asks for a lawyer — provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.
Id. at 461, 114 S.Ct. at 2356.
No clear request for an attorney can reasonably be found in Medley’s broad statements pertaining to his “rights.” See Eaton v. Commonwealth, 240 Va. 236, 252-53, 397 S.E.2d 385, 395-96 (1990) (“We share the U.S. Supreme Court’s preference for ‘bright-line’ rules for the guidance of those who must conduct and evaluate custodial interrogations. In further explication ... we hold that the Edwards rule is invoked, and that custodial interrogation must cease, when the accused, having received Miranda warnings and having begun to respond to the questions of the authorities, ‘has clearly asserted his right to counsel’ ” (quoting Edwards, 451 U.S. at 485, 101 S.Ct. at 1885) (emphasis in original)). To the contrary, the most that one could reasonably glean from Medley’s statements is that he did not wish to speak generally about the drugs found in the car. See, e.g., Anderson v. Smith, 751 F.2d 96, 101 (2d Cir.1984) (noting that where an accused “did not expressly ask for a lawyer,” but indicated he did not wish to waive “these rights,” after Miranda warnings were read to *34 him, a court will assume “that all that he did was to assert his right to remain silent”); see also Edwards, 451 U.S. at 484, 101 S.Ct. at 1884 (noting a distinction between an invocation of the right to remain silent and the right to counsel stating, “additional safeguards are necessary when the accused asks for counsel” (emphasis added)). For these reasons, an Edwards analysis is not appropriate under the circumstances at issue in this case. It is thus clear that police did not violate Medley’s Miranda right to counsel. Accordingly, we affirm his convictions on this basis.
B.
Turning to Medley’s claim that police violated his Miranda right to silence, we note first Miranda recognized that if a suspect “indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627. As previously noted, our standard of review requires us to conduct a de novo review of the application of the protections afforded by Miranda to the historical facts as found by the trial court. Burket v. Commonwealth, 248 Va. 596, 611, 450 S.E.2d 124, 132 (1994) (“Whether a statement is voluntary is ultimately a legal rather than factual question. Subsidiary factual questions, however, are entitled to a presumption of correctness.” (citations omitted)); Correll v. Thompson, 63 F.3d 1279, 1290 (4th Cir.1995). Thus, the issue of whether Medley waived his rights under Miranda is a mixed question of law and fact, and while we are bound by the facts and reasonable inferences that flow from those facts as they relate to Medley’s words and conduct, we are not bound by the legal conclusion of the trial court that Medley “didn’t waive his rights.” Id.
Assuming without here deciding that Medley’s statements and conduct were initially sufficient to equate to a clear and unambiguous assertion of his right to remain silent, we find that the factual circumstances as found by the trial court plainly reveal that, subsequently, when Medley reinitiated *35 contact with Special Agent Wendell and insisted on giving a statement relating to his passenger’s involvement with the drugs, by his own actions, he knowingly, intelligently and voluntarily waived that right.
Indeed, it is well settled that even if invoked, the Miranda right to silence can “be waived by the suspect if the waiver is made knowingly and intelligently.” Jackson v. Commonwealth 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003). In fact, in Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), the United States Supreme Court expressly acknowledged that “a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.” (Emphasis added). Thus, while
[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, [it] is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant’s silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution’s burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.
North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) (emphasis added).
*36 Here, it is clear that police were initially confused as to whether Medley wished to invoke his right to silence. Indeed, after being read his Miranda rights, Medley told Special Agent Wendell that he “would talk to [him], but that he didn’t want to waive his rights.” Special Agent Wendell then explained to Medley that he could not continue to talk to him, “because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions.” Medley responded, “I want all my rights, but I still want to talk to you.” Medley stated, “I don’t want to waive anything on this,” but again stated, “I will talk to you.” After several attempts to explain the Miranda rights to Medley, Medley continued to claim that he “did not want to waive his rights, but ... would talk to [police].” In light of this, police consistently informed Medley that they could not continue to talk with him because they understood that he had invoked his rights under Miranda.
However, approximately thirty minutes after Special Agent Wendell left Medley to wait in the patrol car, Trooper Hawkins approached Wendell and stated, “[Medley] wants to talk to you.” Special Agent Wendell testified that he went to the patrol car and:
again explained to [Medley], if you’re not willing to waive your rights, I cannot talk to you. He said, I — quote and unquote — Mr. Medley stated that he could talk to me because she had nothing to do with the investigation. I then explained to Medley, I don’t want to talk to you unless you’re willing to waive your rights; and he said, I’ll talk to you. I just don’t want anything to be used against me. I’ll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he consistently told me that he wanted to talk to me; and, therefore, I began talking to him.
(Emphasis added). This course of conduct clearly and reasonably indicated to Special Agent Wendell that Medley understood his right to remain silent, understood the fact that “he [had] invoked his rights,” but wished to waive his previously *37 invoked right to remain silent and speak to police about his passenger’s involvement with his activities.
Nevertheless, as indicated above, we recognize that:
The inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions. [Edwards, 451 U.S. at 482, 101 S.Ct. at 1883]. First, the relinquishment of the right “must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.” [Moran, 475 U.S. at 421, 106 S.Ct. at 1141]. Second, “the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the ‘totality of the circumstances surrounding the interrogation’ reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.” Id.
United States v. Cristobal, 293 F.3d 134,139-40 (4th Cir.2002).
As to the first prong of the analysis — the voluntariness of Medley’s ultimate waiver — the United States Supreme Court has held “the admissibility of statements obtained after [a] person in custody has decided to remain silent depends under Miranda on whether his ‘right to cut off questioning’ was ‘scrupulously honored.’ ” Mosley, 423 U.S. at 104, 96 S.Ct. at 326. “A statement procured in violation of Mosley is presumed to have been obtained by an involuntary waiver of Fifth Amendment rights and, therefore, it is inadmissible.” Pugliese v. Commonwealth, 16 Va.App. 82, 88, 428 S.E.2d 16, 21 (1993).
The question of “[w]hether a person’s decision to remain silent has been ‘scrupulously honored’ requires an independent examination of the circumstances.” Id. “This question is one of law subject to de novo review; however, the subsidiary factual findings of the [trial] court are entitled to a presumption of correctness.” Correll, 63 F.3d at 1290 (citing Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 451, 88 *38 L.Ed.2d 405 (1985)); see also Pugliese, 16 Va.App. at 88, 428 S.E.2d at 21 (“In making this determination, an appeals court is ‘bound by the trial court’s subsidiary factual findings unless those findings are plainly wrong.’ ” (quoting Wilson v. Commonwealth, 13 Va.App. 549, 551, 413 S.E.2d 655, 656 (1992))).
In so reviewing this issue, we must keep in mind that the United States Supreme Court, in Davis, advised that “when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether [the suspect] actually wants” to invoke a specified right. Davis, 512 U.S. at 461, 114 S.Ct. at 2356. When viewed properly — in the light most favorable to the Commonwealth as the party prevailing below — the record establishes that the “good police practice” described in Davis, is all that took place here. Indeed, from the beginning of their interaction with Medley, the officers here reasonably believed, based upon Medley’s course of conduct, that he was confused or ambivalent about whether to invoke his right to remain silent. Moreover, once Medley decided to invoke that right, the officers reasonably believed that he was confused or ambivalent about whether to waive the right. In fact, credible evidence in the record suggests that it was only because of Medley’s consistently equivocal and contradictory conduct that police inquired further of Medley to determine whether he understood his rights and/or whether he intended to waive them.
Under these circumstances, we find no reason to conclude that the officers failed to “scrupulously honor” Medley’s right to remain silent. Indeed, there was “nothing coercive or deceitful” in the officers’ conduct toward Medley — particularly given Medley’s consistently contradictory statements. See Land v. Commonwealth, 211 Va. 223, 229, 176 S.E.2d 586, 590 (1970). Furthermore, as his dialog with police officers makes clear, there is no question that Medley was aware of the nature of his right to remain silent and the potential consequences of abandoning that right.
*39 Thus, by consistently reasserting his intent to communicate with police about the involvement of his passenger, and by ultimately doing so — despite the numerous warnings given to him by the officers involved — we find that the officers here reasonably believed, based upon the totality of Medley’s conduct, that he knowingly, intelligently and voluntarily chose to waive any previously invoked right to remain silent. See Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987) (“Miranda gives the defendant a right to choose between speech and silence, and [the defendant] chose to speak.”).
For these reasons, we hold that the trial court did not err in denying Medley’s motion to suppress on these grounds,[2] and we thus, affirm his convictions on this basis as well.

Affirmed,.

. The Commonwealth conceded during oral argument that Medley entered his pleas of guilty upon the condition that he maintain the right to appeal the trial court’s denial of his motion to suppress. Thus, we assume without here deciding, that Medley properly preserved this appeal — despite the fact that the trial court’s final order makes no mention of a conditional guilty plea.

. In light of this holding, we do not address the Commonwealth’s alternative theory that any error on the part of the trial court was harmless, given the magnitude of the remaining evidence against Medley, as weU as his pleas of guilty.