COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judge Humphreys and Senior Judge Annunziata
Argued by videoconference

**PUBLISHED**

NICHOLAS LEE THOMAS

                                                  OPINION BY
v.       Record No. 0176-20-2       JUDGE ROBERT J. HUMPHREYS
                                                  DECEMBER 1, 2020

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Phillip L. Hairston, Judge

Daniel W. Hall (Law Office of Daniel W. Hall, on brief), for
appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


On May 23, 2018, a grand jury for the Circuit Court of the City of Richmond ("circuit court") indicted appellant Nicholas Lee Thomas ("Thomas") on one count each of: first-degree murder, in violation of Code § 18.2-32; use of a firearm in the commission of first-degree murder, in violation of Code § 18.2-53.1; robbery, in violation of Code § 18.2-58; and use of a firearm in a robbery, in violation of Code § 18.2-53.1.

Thomas filed a motion to suppress statements he made to police while in custody. After an evidentiary hearing on the motion to suppress, the circuit court found the statements admissible and denied Thomas's motion. Thomas then entered a conditional *nolo contendere* plea to first-degree murder, pursuant to Code § 19.2-254, and the Commonwealth agreed to move for a *nolle prosequi* on each of the three remaining charges. The plea agreement preserved Thomas's right to appeal the ruling on the motion to suppress. Subsequently, the circuit court sentenced Thomas to fifty years' incarceration and three years of post-release supervision.

On appeal, Thomas argues that the circuit court erred in denying his motion to suppress because police interrogated him in violation of his Fifth Amendment rights after he unequivocally invoked his right to remain silent.

## I. BACKGROUND

On May 11, 2018, Russell Long ("Long") was fatally shot seven times during a robbery. Detective Mark Godwin ("Detective Godwin"), of the Richmond Police Department, identified Thomas as a suspect in the murder investigation. On May 15, 2018, police detained Thomas during the execution of a search warrant at his home and subsequently took him to the Richmond Police Department Headquarters to be interviewed. Thomas's interview with police was recorded, and the video of Thomas's interactions with the detectives is part of the record before us. During the interview, Thomas told Detective Godwin that it was not the first time his rights had been read to him. Detective Godwin advised Thomas of his right to remain silent and his right to counsel pursuant to Miranda v. Arizona, 384 U.S. 436, 479 (1966),[1] and Thomas subsequently signed a written waiver of his so-called "Miranda rights." Detective Godwin interviewed Thomas for less than an hour. The detective felt the interview was not productive and ended it, asking Thomas if he would be willing to give them a DNA sample instead of continuing the conversation, to which Thomas consented.

Detectives Russell ("Detective Russell") and Bridges ("Detective Bridges") entered the interview room a short time later. They questioned Thomas while taking a DNA swab and continued questioning him after it was complete. After several moments, Thomas stated, "Imma stop talking." Detective Russell immediately stood up and asked him, "Listen to me. Did we treat you right?" Thomas nodded affirmatively. Detective Russell continued, "Nobody mistreated you,

---

[1] Thomas does not contest that Detective Godwin properly advised him of his Miranda rights before and during any questioning.

- 2 -

right? We gave you every opportunity to talk to us, is that fair?" Thomas nodded yes again. Detective Russell asked, "Okay, so you can't say we didn't try, right?" The detective paused until Thomas answered, "Yes." Detective Russell then stated, "Okay, I'm asking, I want to be fair, if there's something you need me to correct, let's do it." Thomas was silent and nonresponsive. Detective Russell then asked, "Okay, we're basically friends here, right? It's just a job, right? Can you shake my hand?" and put his outstretched hand in front of Thomas, who did not respond. Detective Russell asked, "You can't do that for me?" When Thomas did not respond, Detective Russell patted him on the arm. Detective Bridges then asked for Thomas's mother's phone number so he could call her. Thomas provided his mother's name and number.

Immediately afterward, as Detective Russell was on his way out of the room, he turned and asked Thomas if he knew what charges were pending against him. Thomas did not respond. The detective turned toward Thomas and said, "What do you think it is?" Thomas was silent. Detective Bridges suggested, "Robbery?" Thomas flicked his hand and said "Robbery." Detective Russell said, "Robbery, use of a firearm, first-degree murder, and use of a firearm." Detective Russell then asked if Thomas was aware of the penalties for those crimes. Thomas said nothing and rubbed his face. Detective Russell said, "I'll be more than glad to explain it if you'd like me to." Thomas nodded yes. Detective Russell stated the penalties: "First-degree murder carries a life sentence. Life. Robbery is five to forty.[2] Of course, they're gonna ask for a jury, because of this guy's, you know, how he was. And the jury sentences you, you're twenty, the other young man is seventeen, he's going to catch a break." Thomas immediately asked Detective Russell why the other suspect would "catch a break" and if it was because he was a juvenile. Detective Russell replied, "Well, he

---

[2] The detective was mistaken. Robbery is punishable in Virginia by a minimum sentence of five years and a maximum of life imprisonment. Code § 18.2-58.

talked." Detective Bridges said, "He got the story. You don't think he should get as much of a break?" Shortly afterward, Thomas admitted his involvement in Long's killing.

On May 22, 2019, Thomas filed a motion to suppress the statements he made to police asserting that the detectives violated his right to remain silent by continuing to question him after he invoked his right to silence. The circuit court denied the motion to suppress. Specifically, the circuit court held that Thomas's statement was not a clear and unequivocal invocation of his right to remain silent and that his statements to police were entirely voluntary. This appeal follows.

## II. ANALYSIS

### A. Invocation of the Right to Remain Silent

"We review the circuit court's factual findings in denying a motion to suppress for clear error but review its application of the law *de novo*." Commonwealth v. Quarles, 283 Va. 214, 220 (2012) (citing Brooks v. Commonwealth, 282 Va. 90, 94-95 (2011)). The contents of a defendant's statements are a question of fact that we review only for clear error. Commonwealth v. Redmond, 264 Va. 321, 327 (2002). Whether a statement sufficiently invokes or waives the right to silence is a legal question we review *de novo*. Id. (citing United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir. 1993)). "In reviewing the [circuit] court's denial of the motion to suppress, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences deducible therefrom." Giles v. Commonwealth, 28 Va. App. 527, 532 (1998).

The Fifth Amendment of the United States Constitution guarantees that, "[N]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Upon taking a suspect into custody, police are required to warn him of his right to an attorney and the right to remain silent during questioning by police. Miranda, 384 U.S. at 479. If the defendant indicates that he wishes to remain silent at any point prior to or during questioning, "the

- 4 -

interrogation must cease." Edwards v. Arizona, 451 U.S. 477, 482 (1981). Here, Thomas argues that he affirmatively invoked his right to remain silent by saying, "Imma stop talking."

Both the right to remain silent and the right to counsel require the suspect to unambiguously invoke them. Berghuis v. Thompkins, 560 U.S. 370, 381 (2010). In the context of the right to counsel, "[A]mbiguity arises from the circumstances leading up to the statement, along with the statement itself, rather than the words of the statement alone." Stevens v. Commonwealth, 57 Va. App. 566, 577 (2011). Similarly, in determining whether a suspect unambiguously invoked his right to silence, we consider the substance of the statement as well as the context in which it was made. See Midkiff v. Commonwealth, 250 Va. 262, 267 (1995).

This Court has previously held that a suspect's statement that he "didn't have anything more to say" and the questioning detective should "buckle up for the long ride," accompanied by the suspect's turning his chair away, putting his foot up on the wall, and closing his eyes was not a clear and unambiguous assertion of the right to remain silent. Green v. Commonwealth, 27 Va. App. 646, 654 (1998). The Supreme Court of Virginia has held that "Do I have to talk about it now?" was not a valid invocation of the right to silence, nor was "I just don't think that I should say anything." Burket v. Commonwealth, 248 Va. 596, 610 (1994); Akers v. Commonwealth, 216 Va. 40, 45-46 (1975). Similarly, the statement "I ain't got shit to say to y'all" did not constitute a sufficiently unambiguous invocation of the right to counsel. Mitchell v. Commonwealth, 30 Va. App. 520, 526-27 (1990).

Here, when Thomas stated, "Imma stop talking," Detective Russell immediately stood up and moved away from the interview table. Because Thomas had his head in his hands and spoke the words very softly, the audio of his statement is such that it is difficult to clearly discern whether this statement was directed at the detectives or himself. Assuming without deciding that Thomas's statement amounted to a clear and unambiguous assertion of his right to remain silent, we must

- 5 -

decide whether the detectives' questioning violated Thomas's right to remain silent, and whether he waived that right.

## B.  The Roots of Miranda

The Fifth Amendment privilege is part of a broader evidentiary family of "testimonial privileges."  See Hartigan v. Commonwealth, 31 Va. App. 243, 249 (1999).  Other members of the family include the spousal privilege, the attorney-client privilege, the doctor-patient privilege, and the priest-penitent privilege.  However, the privilege against compelled self-incrimination is the only one that enjoys constitutional status.  See Husske v. Commonwealth, 252 Va. 203, 204 (1996) (discussing the constitutional privilege against answering questions in either civil or criminal proceedings where the suspect's answers may incriminate him).  Nevertheless, as with all testimonial privileges, the privilege against self-incrimination is a limited exemption from a basic obligation.

The fundamental societal rule is that in the pursuit of full disclosure in the courtroom, in civil and criminal trials alike, "the public has a right to every man's evidence."  Kastigar v. United States, 406 U.S. 441, 443 (1972).  However, public policy sometimes justifies an exemption from that testimonial obligation.  Because such exemptions are generally disfavored, the party asserting a testimonial privilege bears the burden of first, expressly claiming it, Rogers v. United States, 340 U.S. 367, 370 (1951), and second, demonstrating an entitlement to it, Hoffman v. United States, 341 U.S. 479, 486 (1951).

> The [Fifth A]mendment speaks of compulsion.  It does not
> preclude a witness from testifying voluntarily in matters which
> may incriminate him.  If, therefore, he desires the protection of the
> privilege, he must claim it or he will not have been considered to
> have been "compelled" within the meaning of the Amendment.

United States v. Monia, 317 U.S. 424, 427 (1943).

Although <u>Miranda</u> was held by <u>Dickerson v. United States</u>, 530 U.S. 428, 438 (2000) to be of "constitutional status," the Supreme Court has consistently held <u>Miranda</u>'s dual warnings or advisements to be purely a set of prophylactic rules designed to implement the foundational Fifth Amendment privilege. <u>See</u> <u>id.</u> at 437-38.

In <u>Oregon v. Elstad</u>, 470 U.S. 298, 309 (1985), Justice O'Connor distinguished <u>Miranda</u>'s implementing rules from the underlying constitutional privilege: "If errors are made by law enforcement officers in administering the prophylactic <u>Miranda</u> procedures, they should not breed the same irremediable consequence as police infringement of the Fifth Amendment itself." In <u>Connecticut v. Barrett</u>, 479 U.S. 523, 528 (1987) (emphasis added), the Supreme Court similarly stated, "It remains clear, however, that this prohibition on further questioning . . . is *not itself required* by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose."

The Supreme Court observed in <u>Davis v. United States</u>, 512 U.S. 452 (1994), with respect to the <u>Miranda</u> right to counsel: "The right to counsel established in <u>Miranda</u> was one of a 'series of recommended "procedural safeguards" . . . [that] *were not themselves rights protected by the Constitution* but were instead measures to insure that the right against compulsory self-incrimination was protected.'" <u>Id.</u> at 457 (alteration in original) (emphasis added). <u>See also</u> <u>Montejo v. Louisiana</u>, 556 U.S. 778 (2009); <u>Withrow v. Williams</u>, 507 U.S. 680, 690-91 (1993) ("<u>Miranda</u>'s safeguards are not constitutional in character."); <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176-77 (1991); <u>Michigan v. Harvey</u>, 494 U.S. 344, 350-51 (1990); <u>Duckworth v. Eagan</u>, 492 U.S. 195 (1989); <u>Solem v. Stumes</u>, 465 U.S. 638, 644-45 (1984).

Distinguishing between a mere implementing rule and the underlying constitutional protection it implements is important to any <u>Miranda</u> analysis. To understand the coverage of an implementing rule, in terms of both its reach and its limits, one must necessarily understand the

coverage of the thing that the rule implements; the latter that controls the former. As the Maryland Court of Special Appeals explained in Reynolds v. State, 594 A.2d 609, 614 (Md. Ct. Spec. App. 1991), "The scope of an implementing rule can be no broader than the scope of the undergirding constitutional protection being implemented."

The starting point for any inquiry into the coverage of Miranda is the Fifth Amendment to the Constitution of the United States. That amendment is broad in its scope. One of its five provisions is the privilege against compelled self-incrimination. U.S. Const. amend. V. The confluence of the implementing rule and the thing implemented was squarely stated in United States v. Mandujano, 425 U.S. 564, 579 (1976): "[Miranda] expressly rested on the privilege against compulsory self-incrimination; the prescribed warnings sought to negate the 'compulsion' thought to be inherent in police station interrogation."

A Fifth Amendment and Miranda analysis is incomplete without examining the facts for an element of compulsion. Miranda's prophylactic safeguards are designed to protect the individual's constitutional right to be free from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The constitutional privilege guards against only one form of self-incrimination: *compelled* self-incrimination. Elstad, 470 U.S. at 306-07 ("The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony."). Because volunteered statements of any kind do not implicate the Fifth Amendment, they are unaffected by Miranda's precautionary evidentiary rules. Miranda, 384 U.S. at 478. There is no such thing as a general constitutional privilege against self-incrimination. Nor does there exist a constitutional privilege against inadvertent self-incrimination or against self-incrimination as a result of stupidity. See United States v. Washington, 431 U.S. 181, 186-87 (1977) ("[I]t is . . . axiomatic that the [Fifth] Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to

- 8 -

questions put by government officials."). The constitutional privilege guards against only one form of self-incrimination: *compelled* self-incrimination.

## C. Custodial Interrogation

Miranda announced a bright-line formula that the combination of custody and interrogation will be deemed to be presumptively coercive, though as with most presumptions, it is rebuttable. See Miranda, 384 U.S. at 467. Nevertheless, custodial interrogation gives rise to the presumption of compulsion, catalyzing the therapeutic, implementing rule of Miranda. See Edwards, 451 U.S. at 481-82. Absent the combination of both custody and interrogation, there is no presumption of compulsion and there is, therefore, no call for Miranda's implementing countermeasures. See Washington, 431 U.S. at 187-88 ("The Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions . . . [t]he constitutional guarantee is only that the witness not be compelled to give self-incriminating testimony.").

In the case before us here, there is no question that Thomas was in custody. The question is whether his incriminating statements were the result of interrogation and, if so, whether he voluntarily waived his right to silence before making them.

In its simplest form, interrogation is an easy concept to grasp. It is a police officer asking a suspect about his involvement in a crime after the suspect has been taken into custody or otherwise deprived of his freedom of action in any significant way. See Miranda, 384 U.S. at 444. The exact definition of what constitutes an interrogation is nebulous and, at times, not well-defined. See Blain v. Commonwealth, 7 Va. App. 10, 15 (1988) (discussing the functional equivalent of interrogation). It is not always an orchestrated set of alternating questions and answers. Every "question" by police does not necessarily actually end with a question mark. See Gates v. Commonwealth, 30 Va. App. 352, 355-56 (1999).

Fourteen years after Miranda, the Supreme Court first took up this problem in Rhode Island v. Innis, 446 U.S. 291 (1980). Innis held that for Miranda purposes, interrogation includes police communication that is the functional equivalent of questioning. Id. at 300-01. Words or actions constitute the functional equivalent of questioning when the officers should know their communication is "reasonably likely to elicit an incriminating response from the suspect." Timbers v. Commonwealth, 28 Va. App. 187, 195 (1998) (quoting Innis, 446 U.S. at 301). Coercive police activity is a "necessary predicate" to finding that a confession was involuntary. See Colorado v. Connelly, 479 U.S. 157, 167 (1986). Further, a suspect may be visibly emotional, confused, or depressed during questioning, but that does not automatically render his confession or waiver invalid, nor does it necessarily indicate that the police methods were coercive. Harrison v. Commonwealth, 244 Va. 576, 583 (1992) (citation omitted). The ultimate test is whether, considering the totality of the circumstances, the free will of the suspect was overborne. See Rogers v. Richmond, 365 U.S. 534, 544 (1961). When making a voluntariness determination, we examine the specific facts of the case to determine whether the officers' methods constituted coercive police activity. See id. at 584.

Put another way, in the context of their brief conversation with Thomas, we must determine if the detectives should have known that Thomas would likely be moved to make a self-incriminating response to their questions and statements. If they did not, we must then decide if Thomas's responses to the detectives' statements constituted a voluntary waiver of his previous decision to remain silent.

Whereas straightforward interrogation can be easily identified, there is also ambiguous police behavior that may or may not be deemed the functional equivalent of interrogation. When determining if an interaction between a suspect and the police constituted interrogation, the reviewing court must look outside the box of literal "interrogation" to the larger picture. See

Gwaltney v. Commonwealth, 19 Va. App. 468, 472 (1995) ("Whether [such] a statement was voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances."). The court must examine whether police behavior involved the sort of coercion, defined as conduct that actually implicates the compulsion element of the privilege against compelled self-incrimination, that Miranda was designed to prevent. See Blain, 7 Va. App. at 15 ("If a suspect's statement was not foreseeable, then it was volunteered.").

In deciding whether particular police conduct is interrogation, we must remember that the purpose behind the Miranda and Edwards decisions was preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. See Doe v. United States, 487 U.S. 201, 212 (1988); Hartigan, 31 Va. App. at 249. We think the Sixth Circuit most accurately and succinctly described the scope of Fifth Amendment Miranda rights: "If a reasonable person, using all of the facts and circumstances available, would view the police as attempting to obtain a response to use at trial, it is an 'interrogation.'" Bachynski v. Stewart, 813 F.3d 241, 246 (6th Cir. 2015).

### D. Waiver of the Right to Silence

"[I]t is well settled that even if invoked, the Miranda right to silence can 'be waived by the suspect if the waiver is made knowingly and intelligently.'" Medley v. Commonwealth, 44 Va. App. 19, 34 (2004) (*en banc*) (quoting Jackson v. Commonwealth, 266 Va. App. 423, 432 (2003)).

Miranda and its progeny do not require a waiver regarding the right to silence be in writing or verbally expressed, nor do they preclude a conclusion that a waiver occurred based on the defendant's course of conduct. See Angel v. Commonwealth, 281 Va. 248, 259 (2011) (citing Harrison, 244 Va. at 582). As such, waiver may be inferred from the words and actions of the

- 11 -

person being interrogated. Harrison, 244 Va. at 582 (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

We find our prior holding in Medley instructive. In that case, we found that while Medley understood his right to remain silent and his choice to invoke his rights, he affirmatively waived his previously invoked right to silence by voluntarily reinitiating conversation with the police. Medley, 44 Va. App. at 36-37. An individual's relinquishment of his right to silence must be a voluntary, free, and deliberate choice and not the result of police intimidation, coercion, or deception. Id. at 37 (quoting United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002)).

Additionally, any waiver must be made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. Id. (quoting Cristobal, 293 F.3d at 139-40). We determine whether both prongs of this test are met by evaluating the totality of the circumstances surrounding the interrogation. Id. (quoting Cristobal, 293 F.3d at 139-40). "Factors relevant to this determination include 'the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview.'" Keepers v. Commonwealth, 72 Va. App. 17, 37 (2020) (quoting Washington v. Commonwealth, 43 Va. App. 291, 302-03 (2004)).

Thomas relies upon the last two factors and argues that despite his assertion of his right to silence, the detectives continued to interrogate him in order to obtain incriminating evidence.

Once a suspect invokes his right to remain silent, police are prohibited from interrogating him further unless the suspect voluntarily reinitiates questioning or a significant amount of time passes. See Michigan v. Mosley, 423 U.S. 96, 106 (1975). This Court has previously recognized a routine booking question exception "which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services." Watts v. Commonwealth, 38 Va. App. 206, 215-16 (2002). However, the exception "does not mean . . . that any question

asked during the booking process falls within that exception. . . . [T]he police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Id. at 216 (alterations in original) (quoting Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990)).

We held that the test to determine if there was a police interrogation is "whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." Id. at 217 (quoting Gates v. Commonwealth, 30 Va. App. 352, 355-56 (1999)). The issue in this case is whether the detectives' statements regarding Thomas's charges and their potential penalties, as well as their reference to the minor defendant being treated more leniently, were objectively designed to elicit an incriminating admission.

We find our jurisprudence on the right to counsel to be instructive:

> [T]here are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of the accused to open up a more generalized discussion relating directly or indirectly to the investigation.

Giles v. Commonwealth, 28 Va. App. 527, 534 (1998) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983)).

Similarly, not every statement by an accused can fairly be considered further conversation that effectively waives the accused's right to silence. Nor can every statement made by an officer, after a suspect invokes his or her right, be accurately described as communication designed to elicit an incriminating response. Questions that arise out of and during the routine incidents of the custodial relationship are distinct from those coercive in nature. See id.

As we noted in Giles, asking a suspect if he would like something to eat or drink or if he would like to use the bathroom would not be considered coercive as likely to elicit an incriminating response. Id. However, those questions do not seek biographical "booking" information, either.

- 13 -

The lack of a coercive element to police conduct and not strictly the content of any statement is the distinguishing factor between what <u>Miranda</u> allows and what it forbids. <u>See</u> <u>Gwaltney</u>, 19 Va. App. at 472 ("The burden is upon the Commonwealth to prove that extra-judicial inculpatory statements were made voluntarily before they can be admitted in evidence . . . ."). "Fidelity to the doctrine announced in <u>Miranda</u> requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437 (1984).

Although not previously comprehensively addressed by the appellate courts of the Commonwealth, many of our sister federal and state courts have addressed the parameters of questions and conduct by the police that do *not* constitute interrogation. These included police conduct that was uncoercive in nature, questions by police that did not relate to a suspect's involvement in a crime, or communication that did not constitute biographical information necessary for case processing or pre-trial services, all of which fall outside the prophylactic remedy of <u>Miranda</u>.[3] Indeed, as the United States Supreme Court has noted, "[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." <u>Washington</u>, 431 U.S. at 187.

Therefore, if a suspect's statements "represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation," officers may

---

[3] <u>See, e.g.</u>, <u>Illinois v. Perkins</u>, 496 U.S. 292 (1990) (statements to undercover officer posing as a prisoner while in prison were not the result of custodial interrogation); <u>United States v. Payne</u>, 954 F.2d 199 (4th Cir. 1992) (declaratory statement by federal agent that police had found a gun in defendant's house did not constitute interrogation requiring <u>Miranda</u> warnings); <u>Prioleau v. State</u>, 984 A.2d 851 (Md. 2009) ("What's up?" was a general term of salutation, and it was not reasonable to view phrase as designed to elicit an incriminating response); <u>State v. Spencer</u>, 826 A.2d 546 (N.H. 2003) (showing a defendant bank surveillance photographs prior to apprising her of her <u>Miranda</u> rights was not the functional equivalent of custodial interrogation); <u>State v. Hambly</u>, 726 N.W.2d 697 (Wis. Ct. App. 2006) (detective's statement to defendant that his arrest was related to three cocaine sales to a named informant was not functional equivalent of interrogation for <u>Miranda</u> purposes), <u>aff'd</u>, 745 N.W.2d 48 (Wis. 2008).

reasonably conclude that the suspect has implicitly waived his right to remain silent and may resume interrogation. Bradshaw, 462 U.S. at 1045. In Harrison, the Supreme Court of Virginia held that a suspect validly reopened the dialogue with police and waived his Miranda rights by inquiring "what was going to happen to him." Harrison, 244 Va. at 583.

We find two cases with factual similarities to this case particularly persuasive. The Ninth Circuit has held that a government agent's statements to an arrestee after he had received his Miranda warnings and had invoked his right to remain silent did not constitute interrogation as the agent merely told the arrestee that a large quantity of cocaine had been seized and that the arrestee "was in serious trouble." United States v. Moreno-Flores, 33 F.3d 1164, 1169 (9th Cir. 1994). Such statements were not express questions that reasonably would call for an incriminating response, and the fact that police statements to the suspect "may have struck a responsive chord" was insufficient to find them the functional equivalent of interrogation. Id. at 1169-70.

Likewise, the Seventh Circuit considered a factually similar case and held that an officer's statement regarding the evidence and possible consequences of a conviction did not rise to the level of interrogation. Easley v. Frey, 433 F.3d 969 (7th Cir. 2006). "As the Fourth Circuit observed in United States v. Payne, 'information about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow." Id. at 974 (quoting United States v. Payne, 954 F.2d 199, 202 (4th Cir. 1992)).

The questions posed to Thomas by Detectives Russell and Bridges after he said "Imma stop talking now" were not of the variety that police should know are reasonably likely to elicit an incriminating response. Likewise, telling a suspect about the charges filed against him and their corresponding penalties would not reasonably call for an incriminating response. Neither were the detectives' statements regarding the minor co-defendant coercive or deceitful. Pursuant to current Code § 19.2-291.1, the Commonwealth requires that adult defendants be both tried and sentenced

- 15 -

by a jury. Conversely, although juvenile offenders may be tried by jury, they may only be sentenced by a judge. Code § 16.1-272. Detective Russell simply explained that sentencing distinction to Thomas when Thomas re-engaged in conversation with the officers. Instead of remaining silent, Thomas re-opened the conversation with Detective Russell when he asked why his co-defendant would likely get a lesser sentence and then inquired if it was because the co-defendant was a juvenile.

Thomas clearly indicated his waiver of the right to remain silent by his voluntary verbal interactions with the detectives. The totality of the circumstances reveals that Thomas had already been informed of his right to counsel and his right to remain silent. Further, Thomas confirmed to Detective Godwin that his <u>Miranda</u> rights were communicated to him on a previous occasion in police custody and that he was familiar with them.

When all the facts in this case are considered in conjunction with one another and in the light most favorable to the Commonwealth as the party that prevailed in the circuit court, we conclude that Thomas was not subject to the type of police conduct that would compel a reasonable person to incriminate themself in violation of the Fifth Amendment and Thomas's voluntary communication with police demonstrated a knowing, intelligent, and voluntary waiver of any previously invoked right to silence. The judgment of the circuit court is therefore affirmed.

<u>Affirmed.</u>