COURT OF APPEALS OF VIRGINIA


Present:   Chief  Judge Felton, Judges Frank and Kelsey
Argued at Salem, Virginia


JAMIL ALI RASHAD
                                                                    OPINION BY
v.        Record No. 2536-05-3                        JUDGE ROBERT P. FRANK
                                                                    OCTOBER 23, 2007
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Mosby G. Perrow, III, Judge

William F. Quillian, III, for appellant.

J. Robert Bryden, II, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Jamil Ali Rashad, appellant, was convicted by a jury of two counts of robbery in

violation of Code § 18.2-58; three counts of using a firearm during the commission of various

felonies, in violation of Code § 18.2-53.1; statutory burglary while armed with a deadly weapon,

in violation of Code § 18.2-91; and unlawfully wearing a mask in public, in violation of Code

§ 18.2-422.  On appeal, he contends the trial court erred:  (1) by not suppressing his statements

after he invoked his right to counsel; and (2) by finding the evidence sufficient to convict him of

use of a firearm in the commission of burglary when the underlying offense was statutory

burglary.

For the reasons stated, we affirm the judgment of the trial court.

BACKGROUND

On January 1, 2004, appellant was arrested for a number of offenses, including those listed above,[1] and was transported to the Lynchburg Police Department for questioning. Police videotaped the interrogation.

Investigator R.S. Trent and Captain Brandon Zuidema both testified at the suppression hearing regarding appellant's interview. Investigator Trent informed appellant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and explained to appellant the "Advice of Rights" form. The following discourse occurred between the officers and appellant:

> [APPELLANT]: Um, can I have an attorney present before I sign this paper, man?
>
> TRENT: Are you asking for a lawyer?
>
> [APPELLANT]: Yeah.
>
> TRENT: Okay.

At this point, Investigator Trent and Captain Zuidema got up to leave the interview room. As the officers stepped out of the door, appellant then asked:

> [APPELLANT]: Um, Mr. ----
>
> ? Hum. . .
>
> [APPELLANT]: I mean uh, can the uh lawyer come down here now while y'all um questioning me?
>
> TRENT: For real, we can't talk to you anymore. I mean, you've asked for a lawyer . . . you know, you've already asked for a lawyer so we . . . can't talk about this now. I mean, are you asking to talk to us without a lawyer present?
>
> [APPELLANT]: Oh well, I can talk I can answer whatever questions y'all want to ask me.
>
> TRENT: Okay. Are you willing to do that without a lawyer present?

---

[1] The appendix does not recite the specific facts of the offenses, but the facts are not necessary for the analysis.

[APPELLANT]:  Yeah, but I'm not signing nothing . . .

TRENT:        You don't have to sign anything, you don't have to sign a thing.  Okay?  You understand what was read to you?

[APPELLANT]:  Yeah I understand it . . .

TRENT:        Okay.  You understand . . . you understand this sheet and the rights that I've read to you?

[APPELLANT]:  (Coughing) yeah . . .

TRENT:        You don't have to sign a thing . . .

[APPELLANT]: Yeah I understand . . .

TRENT:        Okay, you understand.

The officers proceeded to interview appellant, and he made several statements admitting his involvement in the robbery, the subject of the motion to suppress.

The trial court concluded that, assuming appellant's request for counsel was unequivocal, appellant initiated further conversation with the police and that appellant voluntarily waived his right to counsel.

This appeal follows.

## ANALYSIS

### I.  CONFESSION

Appellant first contends that the police violated his Fifth Amendment rights when he invoked his right to counsel but the police continued the interrogation.[2]

On appeal from a trial court's denial of a motion to suppress, the burden is on the appellant to show that the trial court's decision constituted reversible error.  Stanley v. Commonwealth, 16 Va. App. 873, 874, 433 S.E.2d 512, 513 (1993).  We view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly

---

[2] Appellant does not contest the validity of the original Miranda warnings.

- 3 -

deducible therefrom.  Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).  We review the trial court's findings of historical fact only for "clear error," but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case.  Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996); see also Ornelas v. United States, 517 U.S. 690, 699 (1996).

Included among the safeguards established in Miranda, is the right of a suspect to have counsel present at any custodial interrogation and to terminate the interrogation by invoking this right.  Edwards v. Arizona, 451 U.S. 477, 485-86 (1981).  "[A]n accused . . ., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Id. at 484-85.

Only if the accused initiates further "communication, exchanges, or conversations with the police," and only if those communications result in the accused changing his or her mind and freely and voluntarily waiving the right to counsel, may the police resume interrogation without violating the Edwards rule.  Arizona v. Roberson, 486 U.S. 675 (1988).

> Once an accused asserts his or her right to counsel, subsequent waiver of that right is not sufficient to make admissible any incriminating statements thereafter obtained, even if investigators have re-Mirandized the accused, unless the statements are initiated by the defendant and shown to be based on a knowing, intelligent, and voluntary waiver.

Giles v. Commonwealth, 28 Va. App. 527, 531, 507 S.E.2d 102, 105 (1998).  The Commonwealth bears the burden of proving, by a preponderance of the evidence, that the defendant's waiver of counsel was voluntary, knowing, and intelligent.  Colorado v. Connelly, 479 U.S. 157 (1986).

In evaluating the admissibility of a statement under the Edwards rule, we apply a three-part analysis.

First, the trial court must determine whether the accused "unequivocally" invoked his or her right to counsel. Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussions or meetings with the police. Third, if the accused did initiate further discussions or conversations with police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

Giles, 28 Va. App. at 532, 507 S.E.2d at 105. Because the Commonwealth concedes that appellant properly invoked his right to counsel, the first element of the Edwards inquiry is not at issue here. Thus, we determine *de novo* whether appellant initiated the discussion that resulted in his statements to the police.[3]

In Oregon v. Bradshaw, 462 U.S. 1039 (1983), the United States Supreme Court held that the defendant, who had previously invoked his right to counsel, initiated further conversation with the police by asking, "Well, what is going to happen to me now?" The Court wrote:

While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in Edwards.

Id. at 1045.

Our inquiry begins with whether appellant initiated the dialogue with Officer Trent. In doing so, we must review the entire exchange between appellant and the officers. See Medley v. Commonwealth, 44 Va. App. 19, 37, 602 S.E.2d 411, 417 (2004) (*en banc*) (noting that a court

---

[3] Appellant does not argue the third prong of the Edwards analysis. Because that issue is not before the Court, we will not address it.

must consider the totality of the circumstances before properly determining whether Miranda rights have been waived). Since appellant does not contest the accuracy of the recorded dialogue, our consideration of the trial court's denial of appellant's motion to suppress is restricted to a *de novo* review of the legal issue of whether appellant's words, taken in context, were sufficient to indicate whether appellant initiated further dialogue with the officers. Id. at 30, 602 S.E.2d at 416.

Here, appellant asked for counsel. Upon hearing that statement, the police terminated the interview, collected their papers, got up, and began to leave the interview room. Clearly, appellant was aware the interview had been concluded and that the officers were leaving the room. Appellant then said, "I mean uh, can the uh lawyer come down here now while y'all um questioning me?"

The record shows that it was unclear by appellant's statement whether he now wished to speak with the police without having a lawyer present, whether he desired to have his lawyer present during questioning, or whether he was simply seeking a clarification of his rights. Given appellant's ambiguous statements, the officers were justified in continuing to question appellant about his decision to remain silent. See Medley, 44 Va. App. at 38, 602 S.E.2d at 420 ("[C]redible evidence in the record suggests that it was only because of Medley's consistently equivocal and contradictory conduct that police inquired further of Medley to determine whether he understood his rights and/or whether he intended to waive them.").

Appellant's question as the officers were exiting the interview room was an invitation for Officer Trent to discuss how the interrogation would be conducted. See Correll v. Commonwealth, 232 Va. 454, 463, 352 S.E.2d 352, 357 (1987) ("Correll's statement that he wanted to explain the results of his polygraph test was clearly more than a statement arising from the incidents of the custodial relationship. Rather, it was a statement that 'evinced a willingness

- 6 -

and a desire for a generalized discussion about the investigation.'" (quoting Bradshaw, 462 U.S. at 1045-46)).  See also Pittman v. Black, 764 F.2d 545, 547 (8th Cir. 1985) (reasoning that after officers gathered their paperwork and prepared to leave the room, the accused initiated discussions by asking officers if it appeared he was being blamed by other suspects).

In Giles, 28 Va. App. 527, 507 S.E.2d 102, we held that the accused, who had previously invoked his right to counsel, initiated conversation with the police during booking procedures by indicating that he was confused and did not understand the charge against him.  We reasoned that the accused's statement that he was confused and surprised at being charged with robbery "fairly constituted an invitation for Officer Royer to discuss with [the defendant] his situation."  Id. at 535, 507 S.E.2d at 106.  We further stated that the accused's comments "were not necessary inquiries incidental to the booking and custodial relationship."  Id.

Here, by appellant initiating the dialogue, Officer Trent could inquire whether appellant had changed his mind about his request for counsel.  See Foster v. Commonwealth, 8 Va. App. 167, 174, 380 S.E.2d 12, 16 (1989) (recognizing that in certain circumstances police may inquire whether suspect has changed his mind about speaking without an attorney).

> [P]olice legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney.  It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk.  Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision.

Edwards, 451 U.S. at 490 (Powell, J., concurring) (citations omitted).  While reminding appellant they could not talk to him, Trent then inquired whether appellant had changed his decision concerning counsel, i.e., to clarify the meaning of appellant's statement.

Initially, appellant said he would not sign the waiver form without an attorney.  He then said he wanted an attorney.  When the officers left the room, he asked whether the lawyer could

"come down here now" during questioning. The totality of this dialogue entitled Officer Trent to further inquire whether appellant had changed his mind and hence did not amount to police-initiated interrogation within the meaning of Edwards.

## II. USE OF A FIREARM

Appellant next maintains that because he was convicted of statutory burglary pursuant to Code § 18.2-91, he cannot be convicted of a firearm offense under Code § 18.2-53.1, since that statute only proscribes use of a firearm in the commission of common law burglary. The Attorney General responds that Code § 18.2-53.1 refers to the generic term "burglary" without distinguishing between common law burglary under Code § 18.2-89 and statutory burglary under Code §§ 18.2-90, 18.2-91, and 18.2-92. We agree with the Attorney General.

"In construing statutes, courts are charged with ascertaining and giving effect to the intent of the legislature." Crown Cent. Petroleum Corp. v. Hill, 254 Va. 88, 91, 488 S.E.2d 345, 346 (1997). "That intention is initially found in the words of the statute itself, and if those words are clear and unambiguous, we do not rely on rules of statutory construction . . . unless a literal application would produce a meaningless or absurd result." Id. We give the words of a statute "their common, ordinary and accepted meaning," absent an indication by the legislature to the contrary. Gen. Trading Corp. v. Motor Vehicle Dealer Bd., 28 Va. App. 264, 268, 503 S.E.2d 809, 811 (1998). Absent ambiguity, "the manifest intent of the legislature clearly expressed in its enactments should not be judicially thwarted under the guise of statutory construction." Cregger v. Commonwealth, 25 Va. App. 87, 90, 486 S.E.2d 554, 555 (1997).

Code § 18.2-53.1 states in part:

> It shall be unlawful for any person to use or attempt to use any
> pistol, shotgun, rifle, or other firearm or display such weapon in a
> threatening manner while committing or attempting to commit
> murder, rape, forcible sodomy, inanimate or animate object sexual
> penetration as defined in § 18.2-67.2, robbery, carjacking,
> burglary, malicious wounding as defined in § 18.2-51, malicious

- 8 -

bodily injury to a law-enforcement officer as defined in § 18.2-51.1, aggravated malicious wounding as defined in § 18.2-51.2, malicious wounding by mob as defined in § 18.2-41 or abduction.

The statute does not distinguish between different classes of murder, burglary or abduction. "Murder" includes classes such as capital murder (Code § 18.2-31), first and second degree murder (Code § 18.2-32) or murder of a pregnant woman (Code § 18.2-32.1). Categories of abduction include general abduction (Code § 18.2-47), abduction to extort money or for immoral purposes (Code § 18.2-48), and abduction by prisoners (Code § 18.2-48.1). Categories of burglary include common law burglary (Code § 18.2-89), and three distinct types of statutory burglary (Code §§ 18.2-90, 18.2-91, and 18.2-92). Put more precisely:

> In this Commonwealth, there are four statutory forms of burglary and related breaking and entering crimes. Code § 18.2-89 defines traditional burglary (the breaking and entering of a dwelling house of another in the nighttime with the intent to commit a felony or any larceny therein). Code §§ 18.2-90 and 18.2-91 expand traditional common law burglary to include entry without breaking in the nighttime or breaking and entering in the daytime of any dwelling house and various other structures with the intent to commit murder, rape or robbery, Code § 18.2-90, or with the intent to commit larceny, assault and battery or any felony other than rape, murder, or robbery. Code § 18.2-91. Code § 18.2-92 further expands traditional common law burglary and provides that: "If any person break and enter a dwelling house while said dwelling is occupied, either in the day or nighttime, with the intent to commit any misdemeanor except assault and battery or trespass, he shall be guilty of a Class 6 felony."

Johnson v. Commonwealth, 18 Va. App. 441, 445, 444 S.E.2d 559, 561-62 (1994).

Each of the crimes delineated in Code § 18.2-53.1 are crimes of violence or potential violence. The statute does not apply to all felonies. "The purpose of Code § 18.2-53.1 keyed to serious crimes and prescribing inflexible penalties, is to deter violent criminal conduct. The statute not only is aimed at preventing actual physical injury or death but also is designed to discourage criminal conduct that produces fear of physical harm." Holloman v. Commonwealth,

221 Va. 196, 198, 269 S.E.2d 356, 358 (1980); see also Blythe v. Commonwealth, 222 Va. 722, 727, 284 S.E.2d 796, 798 (1981) ("The purpose of [Code ]§ 18.2-53 [now § 18.2-53.1] is to deter the use of specific forms of violence and thus lessen the risk of bodily harm to the potential victims of felonious crime.").

> "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation -- the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety."

Rash v. Commonwealth, 9 Va. App. 22, 25-26, 383 S.E.2d 749, 751 (1989) (quoting People v. Statler, 219 Cal. Rptr. 713, 718 (Cal. Ct. App. 1985)).

Appellant's interpretation of Code § 18.2-53.1 ignores the explicit purpose of the statute. The contention that the term "burglary" is limited to common law burglary ignores the dangers inherent in the circumstances of the statutory burglary statutes.

The distinctions whether there was breaking and entering, breaking only, whether in the daytime or nighttime, whether in a dwelling house, out-building, entering other place of habitation or a business, whether the intent is to commit a felony, larceny, assault and battery, murder, rape or robbery does not diminish the inherent risk of bodily harm or the fear of physical harm.

We therefore conclude that the use of a firearm in the commission of any burglary violates Code § 18.2-53.1.

## CONCLUSION

We conclude the trial court properly refused to suppress appellant's statements and properly found the evidence sufficient to convict appellant of use of a firearm in the commission of burglary.  Accordingly, appellant's convictions are affirmed.

Affirmed.