COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Raphael and Senior Judge Petty
Argued at Richmond, Virginia

PUBLISHED

JAMAR PAXTON

v.      Record No. 0910-22-2

OPINION BY
JUDGE WILLIAM G. PETTY
MARCH 12, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Claire G. Cardwell,[1] Judge

Kelsey M. Bulger, Deputy Appellate Counsel (Virginia Indigent
Defense Commission, on briefs), for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellee.


Jamar Paxton appeals his convictions for second-degree murder and use of a firearm during

the commission of a felony. He argues that the trial court erred by not suppressing incriminating

statements he made to the police after he unequivocally invoked his right to remain silent. We

agree with Paxton that the police did not scrupulously honor his right to cut off questioning. The

trial court therefore should have suppressed his incriminating statements. Its failure to do so was

not harmless. Accordingly, we reverse Paxton's convictions and remand for further proceedings.[2]

---

[1] Judge Beverly W. Snukals presided over the suppression hearings. Judge Cardwell
presided over the trial and sentencing.

[2] "[W]e strive to resolve cases on the 'best and narrowest grounds available.'" *DeLuca v.
Commonwealth*, 73 Va. App. 567, 580 n.4 (2021) (quoting *Delp v. Commonwealth*, 72 Va. App.
227, 235 n.4 (2020)). Given our resolution of Paxton's assignment of error challenging the trial
court's denial of his first suppression motion, we do not address his assignment of error challenging
the trial court's denial of his second suppression motion concerning the same evidence.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

In May 2020, the police arrested Paxton for robbery and use of a firearm following the death of his girlfriend, Dominique Danzy. Detective James Baynes interrogated Paxton at the police station. Baynes read Paxton his *Miranda*[3] rights from a waiver form before questioning him. Paxton then read the form to himself, stated that he understood his rights, and signed the form. The form indicated that Paxton "wish[ed] to waive [his rights] and make a statement."

Baynes told Paxton that he was investigating Danzy's homicide and that the evidence pointed to Paxton's guilt. Baynes conveyed that his investigation established that Paxton and Danzy had purchased a .22 caliber rifle and ammunition on the day of Danzy's death. Baynes also understood that Danzy's car was "taken" at some point "after she was killed." The police later found that car near a hotel where Paxton was staying. They also found the rifle, shell casings, and blood in the car. The shell casings matched shell casings found at the scene of Danzy's homicide, and the police recovered a fingerprint from the rifle.

Paxton claimed that he last saw Danzy around 2:00 p.m. on the day she was killed, she still had her car and the gun at that time, and he later learned about her murder from the news. Baynes challenged Paxton's story and asked Paxton why he shot Danzy. The following exchange then occurred:

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Paxton: Sir I did not shoot her.

Baynes: You did shoot her.

Paxton: I don't wanna talk no more.

Baynes: Ok, that's fair enough, absolutely fair enough. I gave you the opportunity to talk, you didn't want to talk, and that's fine, so you're being charged right now with the carjacking of the car, and use of a firearm in the commission of a felony, and you will be taken to the magistrate and processed.

Paxton: Sir.

Baynes: Yes.

Paxton: What?

Baynes: Mmm-hmm, unless you can come up with a reasonable explanation, . . .

Paxton: Sir, what else do you wanna know? I'm tellin[g] you everything.

Baynes: I wanna hear the truth.

Paxton maintained his innocence for about 20 more minutes while Baynes continued interrogating him. Baynes suggested that Paxton had acted in self-defense and asked what Danzy had done to make Paxton feel like he had to defend himself. Paxton then told Baynes that he shot Danzy after she tried to kill him; he made many incriminating statements to that effect over the next half an hour.

Paxton moved before trial to suppress his incriminating statements, arguing that Baynes failed to stop the interrogation after Paxton unequivocally invoked his right to remain silent. The trial court agreed that Paxton unequivocally invoked his right but found that he then voluntarily reinitiated the interrogation by asking, "What?" In the trial court's view, Paxton "thought he [had] talked his way out of it" and wanted to try again after realizing that he would still be charged. The trial court therefore denied Paxton's suppression motion.

Paxton later filed a second motion to suppress the statements, this time arguing that his statements were involuntary, independent of whether Baynes violated *Miranda*. The court denied that motion as well after a hearing.

During its case-in-chief at trial, the Commonwealth introduced a recording and transcript of the interrogation. Paxton testified in his own defense that he last saw Danzy around 2:00 p.m. on the day she was killed and did not learn about her murder until the next day. During his testimony his attorney asked him about his previous confession to the police. According to Paxton, he tried to tell Baynes that he was innocent and "didn't know anything" but Baynes "didn't want to take that as an answer," "kept telling [Paxton] that [he] did something that [he] did not do," and would not let him end the questioning. After Paxton's attorney asked him, "you watched the entire interrogation with these jurors; why would you confess to a crime you didn't commit?," Paxton explained that he felt like it was the only way to stop the questioning. He also acknowledged "admitting things to the detective" that he testified were untrue.

The jury convicted Paxton of second-degree murder and use of a firearm in the commission of murder. The trial court sentenced Paxton to 33 years' imprisonment with 16 years suspended.

## ANALYSIS

I. The trial court erred by not suppressing Paxton's incriminating statements.

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, the prosecution may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). At a minimum, the police must warn a suspect in their custody that he possesses

certain rights, such as the right to remain silent. *Miranda*, 384 U.S. at 479. The Commonwealth bears the burden of proving that the suspect waived his right to remain silent "knowingly, intelligently, and voluntarily." *Knox v. Commonwealth*, 52 Va. App. 366, 372 (2008) (quoting *Green v. Commonwealth*, 27 Va. App. 646, 652 (1998)).

A suspect may invoke his right to remain silent "at any point prior to or during questioning." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Edwards v. Commonwealth*, 451 U.S. 477, 482 (1981)). He must do so "unambiguously." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). We review de novo "[w]hether a statement sufficiently invokes . . . the right to silence" while "consider[ing] the substance of the statement as well as the context in which it was made." *Id.* (citing *Commonwealth v. Redmond*, 264 Va. 321, 327 (2002); *Midkiff v. Commonwealth*, 250 Va. 262, 267 (1995)). What a defendant actually said is a factual question we review for clear error. *Id.* at 573-74.

We agree with the trial court that Paxton unambiguously invoked his right to remain silent. Our Supreme Court has repeatedly used the statement, "I do not want to answer any more questions" as the exemplar of an unambiguous invocation. *Akers v. Commonwealth*, 216 Va. 40, 46 (1975); *Midkiff*, 250 Va. at 268. Paxton's statement, "I don't wanna talk no more," is similarly unambiguous. That statement clearly and unequivocally conveyed that Paxton did not want to answer any more of Baynes's questions, and the Commonwealth does not argue otherwise on appeal.

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Once the suspect "indicates that he wishes to remain silent . . . 'the interrogation must cease.'" *Thomas*, 72 Va. App. at 574 (quoting *Edwards*, 451 U.S. at 482). Our Supreme Court has adapted the facts of the United States

Supreme Court's decision in *Mosley* into a five-factor test for determining whether the police scrupulously honored the suspect's right when they resume questioning on their own initiative, one factor of which is whether they did so "only after the passage of a significant period of time." *Weeks v. Commonwealth*, 248 Va. 460, 471 (1994) (quoting *Mosley*, 423 U.S. at 106). We sometimes refer to these factors as the *Weeks* factors.

The United States Supreme Court has also held, however, that the police may resume questioning if "the accused himself initiates further communication, exchanges, or conversations with the police" and that reinitiation constitutes a knowing, intelligent, and voluntary *Miranda* waiver. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (quoting *Edwards*, 451 U.S. at 485). Virginia courts have not typically applied the *Weeks* factors to cases involving a claimed reinitiation by the suspect. *See generally Commonwealth v. Quarles*, 283 Va. 214 (2012); *Thomas*, 72 Va. App. 560; *Knox*, 52 Va. App. 366; *Ferguson v. Commonwealth*, 52 Va. App. 324 (2008); *Rashad v. Commonwealth*, 50 Va. App. 528 (2007); *Medley v. Commonwealth*, 44 Va. App. 19 (2004) (en banc); *Giles v. Commonwealth*, 28 Va. App. 527 (1998). Even if the passage of time is not a formal factor in suspect-reinitiation cases, however, it can still inform our analysis in two crucial ways. First, it may inform whether the interrogation had actually ended. Second, when it is ambiguous whether the suspect wishes to reinitiate, a short period of time since the suspect's initial invocation may militate against finding that the suspect had so abruptly changed his mind.

We review de novo whether the police "scrupulously honored" the suspect's invocation of the right to remain silent. *Medley*, 44 Va. App. at 37. The trial court's subsidiary factual findings "are entitled to a presumption of correctness." *Id.* at 37-38 (quoting *Correll v. Thompson*, 63 F.3d 1279, 1290 (4th Cir. 1995); *Pugliese v. Commonwealth*, 16 Va. App. 82, 88 (1993)). When the accuracy of the recorded dialogue or transcript is undisputed, we also review

de novo whether a suspect's statements reinitiated questioning. *Overbey v. Commonwealth*, 65 Va. App. 636, 647 & n.5 (2015) (citing *Rashad*, 50 Va. App. at 536).

An officer interrogates a suspect when "an objective observer would view [the] officer's words or actions as designed to elicit an incriminating response." *Thomas*, 72 Va. App. at 583 (quoting *Watts v. Commonwealth*, 38 Va. App. 206, 217 (2002)). Not every statement by an officer is interrogatory. For example, we have recognized that "telling a suspect about the charges filed against him and their corresponding penalties would not reasonably call for an incriminating response." *Id.* at 586. But we have also made clear that "[t]he police may not ask questions, even during booking, that are *designed* to elicit incriminatory admissions." *Id.* at 583 (emphasis added) (quoting *Watts*, 38 Va. App. at 216). Whether an officer's statement is interrogatory turns on how coercive it is and "not strictly the [statement's] content." *Id.* at 584.

"Similarly, not every statement by an accused can fairly be considered further conversation that effectively waives the accused's right to silence." *Id.* at 583. The Commonwealth must prove that the suspect's statements "represent[ed] a desire on the part of [the] accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 585 (quoting *Bradshaw*, 462 U.S. at 1045). For example, we have held that a suspect who asked "[c]an we just talk later?" and then made incriminating statements when told "there might not be a later" demonstrated a desire to reopen the discussion. *Knox*, 52 Va. App. at 377-78; *see also Correll v. Commonwealth*, 232 Va. 454, 463 (1987) (holding that the suspect showed a willingness to reopen the discussion by offering to explain the results of a polygraph test). By contrast, inquiries "relating to routine incidents of the custodial relationship[] will not generally 'initiate' a conversation." *Bradshaw*, 462 U.S. at 1045.

In this case, an objective observer would conclude that Baynes's request for "a reasonable explanation" of the evidence he presented to Paxton was designed to elicit an

- 7 -

incriminating response and was therefore interrogatory. The Commonwealth does not contend otherwise but maintains that Baynes immediately ceased the interrogation when Paxton invoked his right to remain silent, and Paxton then reinitiated the conversation by stating "Sir. . . . What?" That position is untenable when we view the circumstances in context.

The record establishes that within moments of Paxton's invocation, Baynes undisputedly posed an interrogatory question. Indeed, while facially claiming to honor Paxton's invocation of his right to silence, Baynes dangled the possibility of Paxton escaping criminal liability if he kept talking and provided Baynes with a "reasonable explanation" for the circumstances Baynes had outlined. Baynes's conduct undermines any claim that the interrogation had in fact ended.

We reject the Commonwealth's contention that Paxton voluntarily reinitiated the interrogation. "Any consideration of whether a defendant 're-initiated' the dialogue with police necessarily presumes that police officers have stopped the interrogation." *Ferguson*, 52 Va. App. at 340. We have already concluded that the interrogation had not stopped. Furthermore, neither we nor the Supreme Court have ever held that a suspect reinitiated an interrogation based on so vague a statement as asking the interrogating officer, "What?" We require a much clearer statement of intent before we conclude that Paxton meant to abandon a right he had unequivocally invoked fewer than 30 seconds earlier.

If an officer is unsure whether a suspect wishes to reinitiate the interrogation, he properly may question the suspect about whether he still wishes to remain silent. *Rashad*, 50 Va. App. at 536 ("Given appellant's ambiguous statements, the officers were justified in continuing to question appellant about his decision to remain silent."). For example, the United States Supreme Court held that an officer did not violate *Miranda* when he responded to the suspect's post-invocation question by stating, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire" and continued the interrogation

only after the suspect made clear that he wished to waive his rights. *Bradshaw*, 462 U.S. at 1042, 1046. Similarly, we have held that officers did not violate *Miranda* when they responded to the suspect's post-invocation question by saying "we can't talk to you anymore [because] you've asked for a lawyer" and then asking several questions to clarify whether the suspect wished to waive his right. *Rashad*, 50 Va. App. at 536. So, the police do not violate *Miranda* when they respond to an ambiguous reinitiation by emphasizing the suspect's rights and explaining that they may not talk to him about the case unless he voluntarily waives those rights. *See also Medley*, 44 Va. App. at 36 (holding that officers properly asked questions to clarify the defendant's statement, "I want all my rights, but I still want to talk to you").

By contrast, Baynes did not reiterate Paxton's rights, attempt to answer Paxton's question, or ask Paxton to clarify his question. Instead, he acknowledged that it was "fair" that Paxton had invoked his rights only to immediately challenge Paxton to provide incriminating information. The record demonstrates that Baynes's respect for Paxton's right to remain silent was anything but "scrupulous." Consequently, the trial court erred by denying Paxton's suppression motion.

Moreover, that error was not harmless. When analyzing constitutional harmless error, we ask whether it is "clear beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error." *Commonwealth v. White*, 293 Va. 411, 422 (2017) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 17 (1999)). Incriminating statements, "deliberately made, precisely identified and clearly proved afford[] evidence of a most satisfactory nature and may furnish the strongest and most convincing evidence of truth." *Prince v. Commonwealth*, 228 Va. 610, 613 (1985). Here, Paxton's incriminating statements that he killed Danzy were powerful evidence in a case in which the prosecution's remaining evidence was solely

circumstantial. Thus, we cannot conclude with certainty that the fact finder would have convicted Paxton absent his incriminating statements.

## II. Paxton did not waive his *Miranda* objection by testifying.

We next address the Commonwealth's argument that Paxton waived his challenge to the introduction of his incriminating statements by testifying about those statements at trial. "When 'an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection, and [the appellate court] cannot reverse for the alleged error.'" *Stevens v. Commonwealth*, 72 Va. App. 546, 557 (2020) (alteration in original) (quoting *Hubbard v. Commonwealth*, 243 Va. 1, 9 (1992)). "This legal maxim is sometimes called the 'same-evidence principle.'" *Id.* (quoting *Isaac v. Commonwealth*, 58 Va. App. 255, 260 (2011)). The principle has limits, however. For example, it does not apply to evidence elicited "during cross-examination of a witness or in rebuttal testimony." *Zektaw v. Commonwealth*, 278 Va. 127, 134 (2009) (quoting *Drinkard-Nuckols v. Andrews*, 269 Va. 93, 102 (2005)). And, in cases such as this one, it must yield to the United States Constitution.

"When an accused takes the stand 'in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible.'" *Pearson v. Commonwealth*, 221 Va. 936, 945 (1981) (quoting *Harrison v. United States*, 392 U.S. 219, 223 (1968)). In other words, "the same principle that prohibits the use of confessions [illegally] procured also prohibits the use of any testimony impelled thereby [as] the fruit of the poisonous tree." *Harrison*, 392 U.S. at 222. The prosecution may not, for example, introduce at a retrial the defendant's testimony from a previous trial if that testimony was "impelled by the prosecution's wrongful use of [the defendant's] illegally obtained confessions." *Id.* at 224.

- 10 -

In essence, when the prosecution's illegally-obtained evidence impels the defendant's testimony, that impelled testimony cannot be used as a loophole to cleanse the illegally-obtained evidence. *Id.* at 222. Indeed, considering that a defendant has a right not to testify that is grounded in the same constitutional protections as *Miranda*, the defendant's impelled testimony may be viewed as a continuing violation of his privilege against self-incrimination. *See Salinas v. Texas*, 570 U.S. 178, 184 (2013) (explaining that "a criminal defendant has an 'absolute right not to testify'" (quoting *Turner v. United States*, 396 U.S. 398, 433 (1970) (Black, J., dissenting))). It would thus be inappropriate to apply the same-evidence principle when the "same evidence" is tainted by the same unconstitutional conduct as the challenged evidence.

The Commonwealth urges us to read *Harrison* more narrowly.[4] In the Commonwealth's view, *Harrison* is limited to situations in which a defendant objects at a second trial to the prosecution's use of the defendant's testimony from an earlier trial. But our Supreme Court's holding in *Pearson* undermines the Commonwealth's argument. In *Pearson*, the Court concluded that the trial court had erroneously admitted incriminating statements obtained after the police disregarded Pearson's invocation of his *Miranda* rights. *Pearson*, 221 Va. at 943-44. Despite the fact that Pearson testified about his statements and "confirmed [them] in all material respects," the Court did not apply the same-evidence principle. *Id.* at 945. Instead, the Court took an expansive view of *Harrison*; in considering on direct appeal whether the trial court's error was harmless, the Court declined to consider Pearson's testimony from that *same trial*, as that testimony was tainted by the erroneously-admitted evidence. *Id.* *Pearson* thus makes clear that *Harrison* is not restricted to retrials.

---

[4] Neither party cited to *Harrison* or *Pearson* in their original briefing. We ordered supplemental briefing to address *Harrison* as well as the case of *Bynum v. Commonwealth*, 28 Va. App. 451 (1998).

- 11 -

Trying another approach, the Commonwealth asserts that Paxton failed to establish that the admission of his incriminating statements impelled him to testify.[5] "But, having illegally placed his confessions before the jury, the [Commonwealth] can hardly demand a demonstration by [Paxton] that he would not have testified as he did if his inadmissible confessions had not been used." *Harrison*, 392 U.S. at 224. Even if Paxton would have testified had the Commonwealth not introduced his incriminating statements, the "natural inference" is that he would not have testified *about those statements*. *Id.* at 225-26. The Commonwealth bears the burden of dispelling that inference, *id.* at 226, and it has not done so. After all, Paxton informed the court before trial that its decision whether to suppress the statements would "significantly impact whether [he] testifie[d] or not."

We agree with the parties that our statement in *Bynum v. Commonwealth*, 28 Va. App. 451, 459 (1998), that the defendant's testimony waived his *Miranda* challenge is dicta. When an "alternative justification for [a] ruling [is] unnecessary to the holding, . . . it is dicta." *Lofton Ridge, LLC v. Norfolk S. Ry.*, 268 Va. 377, 383 (2004). We held in *Bynum* that the trial court did not err by admitting the defendant's incriminating statements. *Bynum*, 28 Va. App. at 458-59. The subsequent alternative holding applying the same-evidence principle was therefore dicta that "cannot 'serve as a source of binding authority.'"[6] *Simon v. Commonwealth*, 58 Va. App. 194,

---

[5] The Commonwealth's reliance on Rule 5A:18 is inapposite. Under that rule, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." Rule 5A:18. The basis for reversal is not that the trial court allowed Paxton to testify. The basis for reversal is that the trial court erroneously admitted Paxton's incriminating statements to Baynes; Paxton preserved that argument under Rule 5A:18.

[6] We are also not bound by the unpublished concurrence in *Dozier v. Commonwealth*, No. 0812-07-01 (Va. Ct. App. July 15, 2008) (Kelsey, J., concurring), or the unpublished opinion in *Stevenson v. Commonwealth*, No. 1210-05-1 (Va. Ct. App. May 30, 2006). *See* Rule 5A:1(f) (explaining that unpublished cases are not "binding authority").

201 (2011) (quoting *Newman v. Newman*, 42 Va. App. 557, 566 (2011)). Nor is *Bynum*'s dicta persuasive insofar as it ignores *Harrison* and *Pearson*.[7]

In short, the Commonwealth cannot rely on the effect its illegally-obtained and erroneously-admitted evidence had on inducing Paxton's decision to waive his right not to testify. *Harrison*, 392 U.S. at 224-25; *cf. Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another."). We therefore decline to apply the same-evidence principle in this case.[8]

## CONCLUSION

The trial court erred by finding that Paxton reinitiated the police interrogation. That error was not harmless, and Paxton did not waive his objection to the admission of incriminating statements by testifying about the interrogation. Accordingly, we reverse Paxton's convictions and remand for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*

---

[7] In *Isaac*, a case decided after both *Harrison* and *Pearson*, we stated that the same-evidence principle "affects evidentiary objections based on constitutional as well as statutory and common law grounds." *Isaac*, 58 Va. App. at 260. In making that statement, however, *Isaac* relied solely on the portion of *Bynum* we now recognize as dicta and did not address *Harrison* or *Pearson*. *Id.* None of the other cases cited in *Isaac* applied the same-evidence principle to a constitutional objection. Nor have any published cases since *Isaac* applied the principle to a constitutional objection. Finally, *Isaac* involved a Fourth Amendment objection as opposed to the Fifth Amendment objection before us. We need not determine the full contours of the principle's application to constitutional objections. It is enough to say that *Isaac*'s statement about constitutional objections does not bind us in the face of the more relevant decisions from the United States and Virginia Supreme Courts in *Harrison* and *Pearson*.

[8] Of course, the Commonwealth may use statements obtained in violation of *Miranda* to impeach the defendant's testimony during cross-examination. *Harris v. New York*, 401 U.S. 222, 225-26 (1971). But it may not use those statements as affirmative evidence of guilt during its case-in-chief, as it did here. *Cf. Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (explaining that the presumption that any statement obtained in violation of *Miranda* was compelled is "irrebuttable for purposes of the prosecution's case in chief"). The *Harris* principle therefore does not justify a waiver finding either.

Raphael, J., concurring.

I join the majority's opinion in full, including the discussion in footnote 7. I agree that the Supreme Court's decision in *Harrison v. United States*, 392 U.S. 219 (1968), requires that we find that Paxton did not waive his Fifth Amendment privilege against self-incrimination or his *Miranda* objection simply because he testified in his case-in-chief to the same subject matter as the improperly admitted confession. "The question is not *whether* [Paxton] made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confession[] [itself] inadmissible." *Id.* at 223; *see also Pearson v. Commonwealth*, 221 Va. 936, 945 (1981) (same).

To be sure, the rule in *Harrison*, followed by our Supreme Court in *Pearson*, is in tension with the "same-evidence" waiver principle discussed in *Bynum v. Commonwealth*, 28 Va. App. 451, 459 (1998), and applied in *Isaac v. Commonwealth*, 58 Va. App. 255, 260-61 (2011). We said in *Bynum*, "Having testified about the substance of his previously suppressed statement, Mr. Bynum rendered harmless any error that may have occurred from the introduction of the statement in the Commonwealth's case-in-chief." 28 Va. App. at 459. I agree with the majority (and both parties) that that language was dictum. Based on that dictum, however, *Isaac* twice cited *Bynum* as "holding [that] a defendant, by testifying to the substance of the statement in his case in chief, waived his earlier *Miranda* objection to the prosecution's admission of [that] statement." 58 Va. App. at 260, 262. *Isaac* read *Bynum* broadly, stating that the same-evidence-waiver principle "affects evidentiary objections based on constitutional as well as statutory and common law grounds." *Id.* at 260.

The Commonwealth tells us that we are bound to apply that broad notion of waiver from *Isaac* under the interpanel-accord doctrine. Commonwealth Supp. Br. 17. But I agree with the

- 14 -

majority that that statement in *Isaac* was dictum. As footnote 7 of the majority opinion explains, *Isaac* involved the same-evidence principle as applied to the waiver of a *Fourth* Amendment objection, not a *Fifth* Amendment objection. We should not presume that *Isaac* ignored a "fundamental and longstanding precept" of judicial restraint by deciding the waiver question in *all* constitutional settings, thereby engaging in the "unnecessary adjudication of a constitutional issue." *Taylor v. Commonwealth*, 78 Va. App. 147, 157 (2023) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). Indeed, neither *Bynum* nor *Isaac* cited *Harrison* or *Pearson*, cases that bind us as vertical precedent on the Fifth Amendment question presented here: *Harrison* because it was decided by the Supreme Court of the United States, and *Pearson* because it was decided by the Supreme Court of Virginia.

I therefore agree with the majority that we should not view *Isaac* (let alone *Bynum*) as answering the Fifth Amendment question. I acknowledge, however, that reasonable jurists might disagree on that score.

But even assuming that *Isaac* (or *Bynum*) were deemed binding under the interpanel-accord doctrine, we would *still* be bound by superseding precedent in *Harrison*.[9] The Supremacy Clause makes the Constitution of the United States "the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. V, cl. 2. As a result,

> this much is certain: When a state [appellate] court opinion, whether in dicta or in its holding, conflicts with a holding of the United States Supreme Court on an issue of federal constitutional law, the United States Supreme Court ruling remains the binding precedent—"any state law, decision, or rule to the contrary notwithstanding."

---

[9] The supremacy of federal constitutional law here resolves the issue. So we need not decide whether an analogous rule of State-law supremacy would apply to our following a prior holding of the Supreme Court of Virginia (like *Pearson*) that was overlooked in earlier decisions of this Court.

*Rushing v. Commonwealth*, 58 Va. App. 594, 605 (2011) (quoting *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 221 (1931)), *reversed on other grounds*, 284 Va. 270 (2012). "'Needless to say,' only the United States Supreme Court 'may overrule one of its precedents.'" *Id.* (quoting *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (per curiam)).

By the same token, a state appellate court "'has no discretion to disregard' applicable holdings of the United States Supreme Court." *Id.* (quoting *Jaynes v. Commonwealth*, 276 Va. 443, 458 (2008)). This principle is hornbook law. *See* Bryan A. Garner, et al., *The Law of Judicial Precedent* 679 (2016) ("With a federal question—that is, one arising under the Constitution, statutes, or treaties of the United States—state courts must follow any applicable U.S. Supreme Court decisions, overruling if necessary their own previous decisions to the contrary.").

In short, even if *Isaac* (or *Bynum*) were deemed binding on the waiver question under the interpanel-accord doctrine, *Harrison* would still bind us under the Supremacy Clause.